IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| BRUCKNER TRUCK SALES, INC., ) <br> ) <br> ) <br> *Plaintiff*, ) <br> ) <br> v. ) <br> ) <br> ISABEL GUZMAN, in her Official Capacity ) <br> as Administrator of the Small Business ) <br> Administration; UNITED STATES SMALL ) <br> BUSINESS ADMINISTRATION; JANET ) <br> YELLEN, in her Official Capacity as Secretary ) <br> of the Treasury; UNITED STATES ) <br> DEPARTMENT OF THE TREASURY; and the ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> *Defendants*. ) <br> ) | Civil Action No. 2:23-cv-97 |

## COMPLAINT

1. Without relief from this Court, unlawful federal agency action will cost an Amarillo business more than $10 million.

2. Bruckner Truck Sales, Inc. ("Bruckner") is an American success story. Passed down from father to son to grandsons, Bruckner has endured tough times before. But to get through the COVID-19 pandemic without laying off employees, Bruckner had to accept funds from the Paycheck Protection Program ("PPP"), a federal program created by the CARES Act.

3. Amarillo National Bank (the "Bank"), exercising authority delegated to it by the Small Business Administration ("SBA"), approved Bruckner's application for an SBA-guaranteed PPP loan. Although eligibility for this kind of loan was normally limited to employers with 500 or fewer employees, everyone involved agreed that Bruckner was eligible thanks to a statutory exception for franchise businesses.

4. When Bruckner accepted the money, the statutory rules were clear. As long as Bruckner spent the proceeds on approved expenses (*e.g.*, payroll), then the loan would be forgiven. Bruckner, like countless other businesses trying to make it through the pandemic, would not have to repay any of the PPP money. That is because, under the statute, eligibility for loan forgiveness turns solely on whether the recipient of an SBA-guaranteed loan used the money for permissible purposes (*e.g.*, payroll). *See* 15 U.S.C. § 636m(a)(10), (b), (d)(8).

5. Bruckner followed those rules. No one disputes that Bruckner spent the proceeds (and more) on payroll.

6. SBA nonetheless rejected Bruckner's application for forgiveness. The agency gave only one reason for its decision: it had changed its mind about Bruckner's eligibility for the underlying loan. SBA concluded its agents should not have issued an SBA-guaranteed loan in the first place, invoking its own byzantine franchise rules to conclude that Bruckner had too many employees and that the Bank had misunderstood the eligibility rules. That was error. When deciding whether to issue a guaranteed loan, SBA agents can and should consider the statutory criteria for doing so. But once a guaranteed loan is issued, and SBA is considering whether to forgive that loan, it cannot revisit the issuance decision and eligibility determination. Instead, SBA is limited to considering the statutory criteria: whether the applicant in fact has an SBA-guaranteed loan and whether the applicant spent the funds appropriately.

7. Under the CARES Act, eligibility for loan forgiveness depends on whether the applicant *in fact received* an SBA-guaranteed loan, not whether the applicant *should have received* an SBA-guaranteed loan.

8. SBA rejected this approach based on regulations that contradict the statute. Those regulations are invalid under the Administrative Procedure Act ("APA"), as is SBA's denial of Bruckner's forgiveness application.

9. Even if these regulations were otherwise valid (they are not), SBA would not have the authority to apply them retroactively. Congress has not authorized SBA to promulgate rules retroactively, much less done so with the "clear statement" required by Supreme Court precedent.

10. At the time Bruckner accepted the loan, it was clear that Bruckner would not need to pay back the loan so long as it used the money on approved expenses. Bruckner would not have accepted the loan otherwise. It is likely that Bruckner would have had to scale back its operations and headcount significantly without the loan—exactly what Congress sought to avoid in creating the PPP.

11. Only after Bruckner accepted the loan did SBA purport to change the rules. Only then did SBA claim that its agents' earlier approvals of SBA-guaranteed loans were no longer dispositive and that it would task other agents with revisiting those approvals when processing forgiveness applications.

12. The law does not allow SBA to lure Bruckner into a federal program with appealing terms and then change those terms after the fact. The Court should correct SBA's error, enforce the law Congress passed, and declare that Bruckner is entitled to forgiveness in full of its PPP loan.

**PARTIES**

*Plaintiff Bruckner Truck Sales, Inc.*

13. Bruckner is a family-owned, retail truck dealer. Nearly a century old, the company is no stranger to economic turmoil. Its origins stretch back to the Great Depression.

14. B.M. "Bennie" Bruckner Sr. founded the company—then called "Bruckner's Garage"—in 1932, when he found himself out of work with only a fourth-grade education. After shepherding the company through the Depression, Bennie won Bruckner its first Mack Trucks franchise in 1948. Bennie eventually passed Bruckner onto his son, Ben Jr. And after Ben Jr.'s death in 2012, Bennie's grandsons Brian and Chris took over the family business.

15. Although the company has long outgrown their grandfather's garage, Brian and Chris have dedicated their careers to honoring Bennie's original vision: a business run with honesty and integrity, that values customers and employees, and that does what it takes to get the job done.

16. Through decades of hard work, Bruckner has expanded to include franchise locations throughout the Southwest. Each franchise location purchases and resells new trucks and parts from major truck manufacturers with whom Bruckner has entered into franchise agreements.[1] Two such manufacturers are Mack Trucks ("Mack") and Volvo North America ("Volvo").

17. Bruckner and its franchise locations each operate as separate businesses. Bruckner and each Bruckner franchise has its own separate Mack and/or Volvo franchise agreements. Each franchise has been issued its own, distinct dealer code by Mack and/or Volvo. And Bruckner produces separate monthly financial statements for each separate location.

18. During the relevant period, Bruckner's Amarillo headquarters had approximately 45 employees, its Amarillo center had approximately 72 employees, and each other franchise had fewer than 500 employees per franchise location.

---

[1] Some locations share a single franchise agreement. During the relevant period, there were 13 distinct franchises among the 28 locations.

19. Bruckner is incorporated in Texas. Its principal place of business is in Amarillo, Texas.

*Defendants*

20. Defendant Isabel Guzman is the Administrator of the Small Business Administration. The Administrator is responsible for administering the Small Business Act and Paycheck Protection Program. *See* 15 U.S.C. §§ 631(b)(1), 636(a). Administrator Guzman is sued in her official capacity.

21. Defendant United States Small Business Administration is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. § 551(1).

22. Defendant Janet Yellen is the Secretary of the Treasury. The Secretary, along with the Administrator, issued some of the regulations related to the Paycheck Protection Program. Secretary Yellen is sued in her official capacity.

23. Defendant United States Department of the Treasury is a Department of the Executive Branch of the United States and is an agency within the meaning of 5 U.S.C. § 551(1).

24. Defendant United States of America is the federal sovereign.

**JURISDICTION AND VENUE**

25. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Bruckner's claims arise under federal law and 28 U.S.C. § 1346 because the United States is a defendant. Specifically, Bruckner's claims arise under the Constitution (amend. V); the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"); and other federal statutes, 15 U.S.C. §§ 634(b)(1), 636m.

26. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Bruckner is a resident of this judicial district. It maintains its principal place of business in the Amarillo Division of the Northern District of Texas. Moreover, a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Northern District of Texas.

27. This Court is authorized to award the requested relief under 5 U.S.C. § 706; 15 U.S.C. § 634(b)(1); 28 U.S.C. §§ 1651, 2201, and 2202; and its inherent powers.

28. Sovereign immunity is waived by statute. In any event, sovereign immunity is inapplicable to the *ultra vires* actions of Defendants Guzman and Yellen.

## BACKGROUND

### Legal Framework

29. In the early days of the COVID-19 pandemic, as States began shuttering businesses and isolating their citizens, Congress passed and President Trump signed the Coronavirus Aid, Relief, and Economic Security Act, 134 Stat. 281 (2020) (the "CARES Act" or the "Act"). The CARES Act contained "extraordinary stimulus spending aimed at both controlling the virus and containing its economic fallout." *Vitolo v. Guzman*, 540 F. Supp. 3d 765, 769 (E.D. Tenn. 2021).

30. To ensure that businesses could pay their bills and that workers could continue to earn a living, the Act created the Paycheck Protection Program. PPP has two key features: (1) lenders acting as SBA's agents would approve and issue SBA-guaranteed loans, *see* 15 U.S.C. § 636(a)(36); and (2) lenders, again acting at SBA's direction, would forgive loans used for approved expenses, *see id.* § 636m. The structure of the program was "simple: PPP funds [were to] be used for payroll, mortgage interest, rent, or utilities. If the funds [were] used as required, they

6

d[id] not have to be repaid." *In re Roman Catholic Church of Archdiocese of Santa Fe*, 615 B.R. 644, 654 (Bankr. D.N.M. 2020).

*Issuing SBA-Guaranteed Loans*

31. The Paycheck Protection Program expanded the loan program of the Small Business Act by guaranteeing loans to businesses made on certain favorable terms. Each applicant could receive up to 2.5 times its average monthly payroll, with the amount capped at $10 million per applicant. 15 U.S.C. § 636(a)(36)(E). The loans were to be used to cover "payroll costs," "employee salaries," "utilities," "interest on any mortgage obligation," and "rent," among other things. *Id.* § 636(a)(36)(F)(i).[2]

32. The Paycheck Protection Program permitted an "eligible recipient" to apply for a covered loan. For purposes of section 636(a)(36), "eligible recipient" means "an . . . entity that is eligible to receive a covered loan." *Id.* § 636(a)(36)(A)(iv). "[I]n addition to small business concerns, *any* business concern" was made "eligible to receive a covered loan if the business concern" had "not more than the greater of . . . 500 employees[] or" "the size standard in number of employees established by the Administration for the industry in which the business concern . . . operates." *Id.* § 636(a)(36)(D)(i) (emphasis added).

33. The CARES Act waived certain rules SBA had been using to calculate employee numbers. Those calculations included the employees not only of the business concern itself but also of the business concern's "affiliates." *See* 13 C.F.R. § 121.301. The Act provided that SBA's affiliation rules were "waived with respect to eligibility for a covered loan for . . . any business

---

[2] Loans covered by section 636(a)(36) are known as "first draw PPP loans" to distinguish them from "second draw PPP loans," which are governed by section 636(a)(37). *See* 13 C.F.R. § 134.1201(a). Bruckner received a first draw PPP loan, so only paragraph (36) is discussed here.

concern operating as a franchise that is assigned a franchise identifier code by the Administration." 15 U.S.C. § 636(a)(36)(D)(iv).

34. The Act "delegated authority" of the "[Small Business] Administrator" to "lender[s]" to "evaluat[e] the eligibility" for, "make[,] and approve covered loans." *Id.* § 636(a)(36)(F)(ii)(I)–(II). To apply, "[a]n eligible recipient" had to "make a good faith certification" to a lender that the loan was necessary due to "the uncertainty of current economic conditions" and would "be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments." *Id.* § 636(a)(36)(G)(i).

*Forgiving SBA-Guaranteed Loans*

35. Although the Paycheck Protection Program was ostensibly a loan program, repayment was never "a significant part of th[at] program." *In re Roman Catholic Church of Archdiocese of Santa Fe*, 615 B.R. at 654. "Given the effect of the lockdown," Congress anticipated that "many, perhaps most, applicants would not be able to repay their PPP loans." *Id.* Still, "Congress did not include creditworthiness as a requirement" for PPP loan eligibility because it anticipated that loans guaranteed under the PPP would be forgiven under the loan forgiveness program. *Id.* Put differently, "the 'loans' [were] really grants." *Id.*

36. The CARES Act mandated loan forgiveness for "eligible recipient[s]." 15 U.S.C. § 636m(b). For purposes of the loan forgiveness program, "the term 'eligible recipient' means the recipient of a covered loan," *id.* § 636m(a)(10), which is "a loan guaranteed under section 636(a)(36)," the Paycheck Protection Program, *id.* § 636m(a)(1).

37. For the recipient of a PPP loan to receive forgiveness, the recipient was required to have "use[d] at least 60 percent of the [PPP] loan amount for payroll costs." *Id.* § 636m(d)(8). Assuming that condition was satisfied, the recipient was entitled to forgiveness of an amount equal

8

to payroll costs, utility payments, and mortgage and rent payments (among other expenses specified by statute). *Id.* § 636m(b).

38. The recipient could apply for forgiveness by "submit[ting] to the lender" documentation verifying its expenditures. *Id.* § 636m(e). The lender would have 60 days to "issue a decision on the [] application." *Id.* § 636m(g). And, if the loan was forgiven, SBA would "remit to the lender an amount equal to the amount of forgiveness." *Id.* § 636m(c)(3).

39. In regulations published after Bruckner received its loan, SBA claimed the authority to have other agents review lenders' forgiveness decisions. SBA promulgated regulations purporting to grant its Office of Capital Access the authority to "review" "at any time" "whether a borrower is eligible for the PPP loan." Interim Final Rule, 85 Fed. Reg. 33010, 33012 (June 1, 2020); *accord* Interim Final Rule, 86 Fed. Reg. 8283, 8294 (Feb. 5, 2021). And, the regulations provide, "[i]f SBA determines that a borrower is ineligible for the PPP loan, SBA will direct the lender to deny the loan forgiveness application." 85 Fed. Reg. at 33012; *accord* 86 Fed. Reg. at 8295.

40. SBA permits borrowers to seek administrative review of this kind of loan-forgiveness determination. That is, a borrower may pursue an administrative appeal of a "final SBA loan review decision . . . that finds a borrower . . . [w]as ineligible for a PPP loan." 13 C.F.R. § 134.1201(b); *see also* 86 Fed. Reg. at 8295 (answering "Yes," a borrower may "appeal SBA's determination that the borrower is ineligible for a PPP loan").

41. The regulations provide for an administrative law judge within SBA's Office of Hearings and Appeals ("OHA") to issue "an initial decision" on the appeal petition. 13 C.F.R. § 134.1211(b). And they provide for an opportunity to seek reconsideration of the initial decision. *Id.* § 134.1211(c).

9

42. A reconsidered decision "becomes the final decision of SBA 30 calendar days after its service unless the SBA Administrator . . . decides to review or reverse the reconsidered initial OHA decision." *Id.* § 134.1211(c)(3).

43. Applicants may seek judicial review once the SBA's decision becomes final. *Id.* § 134.1211(g).

**Factual Background**

*Bruckner, decimated by the COVID-19 pandemic, applies to participate in the PPP.*

44. The pandemic and accompanying lockdowns ravaged businesses nationwide. The automotive industry was no exception. Nearly 20,000 new-car dealers sought PPP loans totaling $12.31 billion.[3] And, from April to June 2020 alone, over 3,500 auto dealers sought and were approved for PPP loans in excess of $1 million.[4]

45. Come the second quarter of 2020, Bruckner faced perilous financial circumstances. The value of its used truck inventory dropped 50%. Total revenue dropped 20% compared to the same time the previous year. It was the first unprofitable quarter in over a decade.

46. With no end to the pandemic (or lockdowns) in sight, Bruckner had to consider its options for reducing long-term costs, including reducing its staff. But when it learned about the PPP, Bruckner hoped that layoffs could be avoided.

47. Based on the terms of the CARES Act and the information available to it at the time, Bruckner concluded that it was eligible to apply for a PPP loan. Each Bruckner franchise operated as its own "business concern." *See* 15 U.S.C. § 636(a)(36)(D)(i). Each business concern

---

[3] *SBA Paycheck Protection Program – New Car Dealers*, FederalPay.Org (last updated Apr. 5, 2023), http://bit.ly/42qXy8T.

[4] Yan Wu & Vivien Ngo, *Where Did the Biggest PPP Loans Go?*, Wall St. J. (Jul. 23, 2020), https://on.wsj.com/3oPVQQM.

had fewer than 500 employees. *See id.* Each business concern "operat[ed] as a franchise that is assigned a franchise identifier code by the Administration." *See id.* § 636(a)(36)(D)(iv).[5] Thus, Bruckner believed in good faith that it did not have to aggregate the number of employees from each affiliated business concern when applying the 500-employee limit. *See id.* ("Waiver of affiliation rules").

48. In conversations with Bruckner, Amarillo National Bank and Bruckner's accounting firm, CliftonLarsonAllen, similarly concluded that Bruckner would be eligible for a PPP loan.

49. On April 3, 2020, Bruckner submitted a PPP loan application to Amarillo National Bank. The form indicated that when all of Bruckner's individual franchises were aggregated, its headcount reached 942 employees in total. Bruckner truthfully marked "Yes" in response to the question, "Is the Applicant a franchise that is listed in the SBA's Franchise Directory?" Bruckner completed the certifications required by the CARES Act. Bruckner also certified that it was "eligible to receive a loan under the [SBA] rules in effect at the time the application [was] submitted." And Bruckner requested $10 million to cover monthly payroll, lease interest, utilities, health benefits, and rent.[6]

50. If it were not for the loan-forgiveness element of the Paycheck Protection Program, Bruckner would not have applied for the loan. Bruckner was in need of a long-term solution to its pandemic-related costs, not another pandemic-related liability to repay.

---

[5] *See* SBA, *SBA Franchise Directory* (May 11, 2023), bit.ly/3oP3c73 (showing SBA has assigned franchise identifier codes for Mack and Volvo).

[6] Bruckner's average monthly payroll multiplied by 2.5 was $16,146,386, so the loan request was capped at $10 million, the statutory maximum. *See* 15 U.S.C. § 636(a)(36)(E).

11

51. On April 6, 2020, Amarillo National Bank, exercising SBA's delegated authority, studied Bruckner's application, determined that Bruckner was eligible for PPP participation, and approved the loan. The money was disbursed the same day.

52. On April 13, 2020, the Bank submitted the relevant information to SBA.

*Bruckner complies with the requirements of the CARES Act and seeks loan forgiveness.*

53. Bruckner used its PPP loan to keep its business afloat and to support its employees through the ravages of the pandemic and government-mandated lockdown. From April to October 2020, Bruckner spent over $32.6 million on payroll, far exceeding the $10 million loan and the 60 percent requirement for PPP loan forgiveness. Indeed, Bruckner spent nearly all of its PPP funds by the end of May 2020.

54. On October 23, 2020, Bruckner submitted a loan-forgiveness application to Amarillo National Bank. Three days later, the Bank concluded Bruckner was eligible for forgiveness in full and submitted that decision to SBA.

*SBA denies Bruckner's loan-forgiveness application.*

55. On November 29, 2020, SBA's Office of Financial Program Operations informed Amarillo National Bank that it was reviewing Bruckner's PPP loan and requested additional information.

56. On June 11, 2021, the Office of Financial Program Operations sent Amarillo National Bank a preliminary determination that Bruckner was "ineligible due to size" and sought additional information.

57. On October 7, 2021, the Office of Financial Program Operations reiterated its view and requested from the Bank Bruckner's tax returns and 2019 financial statement. SBA did not seek any information about Bruckner's corporate structure, its business model, or its franchises.

58. On January 18, 2022, the Office of Capital Access ("OCA") "made a final SBA loan review decision" denying Bruckner's loan-forgiveness application in its entirety. OCA asserted that Bruckner was not entitled to loan forgiveness because it had "determined that [Bruckner] was ineligible for the PPP loan" due to the employee count of the company and its franchise locations:

> After review of the documentation provided, the SBA concludes the Borrower business, or together with its affiliates, exceeds the maximum allowable number of employees and the SBA small business size standards.
>
> SBA has determined the borrower exceeds size standards.

The letter contained no further information about the basis for the decision.

59. The Bank informed Bruckner that OCA had denied Bruckner's application for forgiveness.

60. Bruckner challenged that decision by filing an administrative appeal petition. Before the Office of Hearings and Appeals could rule, SBA withdrew its decision so that it could "complete a further review of the Loan." According to SBA, that review was to "include . . . efforts to [determine] whether [Bruckner was] eligible for loan forgiveness." Accordingly, OHA dismissed the appeal petition.

61. On August 17, 2022, OCA issued a second SBA loan review decision. OCA again denied Bruckner's loan-forgiveness application. Again, OCA based its decision on the "determin[ation] that [Bruckner] was ineligible for the PPP loan." OCA reasoned that Bruckner had too many employees. OCA accepted that Bruckner was eligible for "a waiver for affiliation," but it declined to apply the waiver to each franchise because "the franchise waiver does not have a 'per location' exception."

62. Bruckner filed another appeal petition and, when OHA denied that petition, a motion for reconsideration. In addition to challenging SBA's miscalculation of Bruckner's employee

number, Bruckner argued that "SBA was wrong to revisit Bruckner's eligibility for a PPP loan when evaluating Bruckner's forgiveness application."

63. On April 24, 2023, OHA rejected the motion for reconsideration. As relevant here, OHA took the view that it was "valid and consistent with SBA's rules, regulations, and procedures" for "[p]art of the forgiveness process [to be] a review of loan eligibility, because a loan cannot be forgiven if the borrower was not eligible for the loan."

64. Because the SBA administrator did not review or reverse the denial of reconsideration, that denial became the final decision of SBA on May 24, 2023, 30 calendar days after its issuance. *See* 13 C.F.R. § 134.1211(c)(3). OHA's decision is final agency action, and Bruckner has exhausted all administrative remedies.

65. During the pendency of the administrative proceedings, SBA purchased the note from Amarillo National Bank. Thus, at this point, Bruckner owes money to SBA, not Amarillo National Bank, unless Bruckner receives the loan forgiveness for which it qualified.

66. Absent this Court's intervention, Bruckner will be forced to pay $10 million, plus interest.

67. All prerequisites to this suit have been satisfied. There are no jurisdictional or procedural barriers that would impede this Court's resolution of the claims presented in this Complaint.

## CLAIMS

### Count I

**(Unlawfully Denying Forgiveness Based on Regulations that Contradict the Statute)**

68. Bruckner incorporates by reference all preceding paragraphs and incorporates each paragraph of each count as applicable to each other count.

69. The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as those that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

70. OHA's decision denying reconsideration constitutes final agency action reviewable under the APA. *See id.* § 701; 13 C.F.R. § 134.1211(c). And SBA regulations acknowledge that SBA's decisions are subject to this Court's review. *See* 13 C.F.R. § 134.1211(g).

71. Relying on its authority to "issue guidance and regulations implementing [] section" 636m, *see* 15 U.S.C. § 636m(k), SBA has purported to empower OCA to deny loan-forgiveness applications on the ground that the "borrower [was] ineligible for the PPP loan." 85 Fed. Reg. at 33012. And OHA relied on that rule as the sole basis for denying Bruckner's request for loan forgiveness. But OCA and OHA do not have the statutory authority to determine a business's eligibility for a PPP loan either at the time of the loan application or when loan forgiveness is requested.

72. Instead, under the CARES Act, it is the "*lender*" that exercises "delegated authority . . . to make and approve covered loans" and to "evaluat[e] the eligibility of a borrower." 15 U.S.C. § 636(a)(36)(F)(ii) (emphasis added).

73. Here, Amarillo National Bank, the lender, exercised that delegated authority and determined that Bruckner was eligible for a PPP loan. The Bank then issued Bruckner that loan.

74. Nor does the CARES Act grant SBA the authority or discretion to revisit the lender's eligibility determination when the borrower applies for PPP loan forgiveness. Instead, the Act directs that an "eligible recipient *shall* be eligible for forgiveness of indebtedness on a covered loan in an amount equal to" the cost of payroll and other enumerated costs. *Id.* § 636m(b) (emphasis added).

75. For PPP loan-forgiveness purposes, an "'eligible recipient' means the recipient of a covered loan." *Id.* § 636m(a)(10). And "the term 'covered loan' means a loan guaranteed under section 636(a)(36)." *Id.* § 636m(a)(1).

76. Bruckner qualifies for PPP loan forgiveness under the Act. Bruckner is an "eligible recipient" because it was the recipient of a covered loan, a PPP loan guaranteed under section 636(a)(36). The Act therefore provides that Bruckner "*shall* be eligible for forgiveness." *Id.* § 636m(b) (emphasis added).

77. Moreover, Bruckner is entitled to loan forgiveness for the full amount of the $10 million loan because the amount was used to cover costs enumerated in section 636m(b), and at least 60 percent of the loan was used to cover payroll.

78. Because SBA lacks the authority to "rewrite [the] clear statutory terms" that entitle Bruckner to loan forgiveness, SBA's denial of the application—and the Interim Final Rule, on which SBA relied—is not in accordance with law and exceeds SBA's statutory authority. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

### Count II

**(Unlawfully Denying Forgiveness Based on the Retroactive Application of Regulations)**

79. "Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "Elementary considerations of fairness," including those embodied in the Due Process Clause, "dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

80. Because the Due Process Clause prohibits retroactive economic rules that are "harsh and oppressive" in their application, *United States v. Carlton*, 512 U.S. 26, 30 (1994) (citation omitted), "a statutory grant of legislative rulemaking authority will not, as a general matter,

be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms," *Bowen*, 488 U.S. at 208. Those express terms must be "so clear and positive as to leave no room to doubt that" retroactive application is permissible. *Landgraf*, 511 U.S. at 272 (citation omitted). It is not enough that the agency is able to "present[]" "some substantial justification for retroactive rulemaking." *Bowen*, 488 U.S. at 208.

81. SBA has given retroactive effect to the Interim Final Rule, 85 Fed. Reg. 33010. That is, at the time Bruckner applied—and was deemed eligible—for a PPP loan, it was entitled to loan forgiveness so long as it spent the money on approved expenses. There was no statute or rule authorizing SBA to deny forgiveness based on OCA's disagreement with the lender's initial decision to issue a guaranteed loan. It was only later that SBA announced such a rule by promulgating the Interim Final Rule. *See* 85 Fed. Reg. at 33012. And SBA has wielded that rule to deny Bruckner's loan-forgiveness application.

82. Even assuming promulgation of the rule was otherwise within SBA's statutory authority (it was not), Congress did not authorize SBA to apply its rules retroactively. By applying its rules to deny forgiveness for loans already issued based on criteria developed after the loans were issued, SBA acted not in accordance with law and exceeded its statutory authority.

83. Moreover, retroactive application of SBA's rules is harsh and oppressive and therefore unconstitutional. Before the rule was adopted and applied retroactively, Bruckner was entitled to forgiveness of the PPP loan—a loan taken out to offset the ruinous effects of the pandemic and lockdowns. Retroactive application of the rule, by contrast, inflicts its own ruinous, irreparable consequences by forcing Bruckner's family business to repay millions of dollars in debt it otherwise would not have incurred.

84. Retroactive application of the Interim Final Rule is also "arbitrary and irrational." *Carlton*, 512 U.S. at 30 (citation omitted). The CARES Act was enacted to alleviate economic devastation, not to exacerbate it. *See In re Roman Catholic Church of Archdiocese of Santa Fe*, 615 B.R. at 654; *Camelot Banquet Rooms, Inc. v. SBA*, 458 F. Supp. 3d 1044, 1053 (E.D. Wis. 2020). No rational purpose is served by making the terms of Bruckner's PPP loan more burdensome after the fact.

85. The serious constitutional questions raised by SBA's actions provide a further reason not to interpret the CARES Act as authorizing those actions.

## PRAYER FOR RELIEF

WHEREFORE, Bruckner respectfully requests that the Court:

a. Hold unlawful and set aside:

   i. SBA's decision determining that Bruckner was ineligible for PPP loan-forgiveness, and

   ii. The Interim Final Rule and any other SBA rule purporting to permit SBA to condition PPP loan-forgiveness eligibility on PPP loan-issuance eligibility, as applied to Bruckner;

b. Declare that:

   i. SBA's decision denying forgiveness was unlawful and that Bruckner is entitled to forgiveness, and

   ii. The Interim Final Rule and any other rule with the same effect are unlawful, as applied to Bruckner;

c. Award Bruckner the costs of this action; and

d. Award such other and further relief as the Court deems equitable and just.

Dated: June 7, 2023                                    Respectfully submitted,

/s/ William T. Thompson
William T. Thompson (Texas Bar # 24088531)
Kyle D. Hawkins (Texas Bar # 24094710)
LEHOTSKY KELLER COHN LLP
919 Congress Ave., Ste. 1100
Austin, TX 78701
will@lkcfirm.com
kyle@lkcfirm.com
T: (512) 693-8350
F: (833) 233-2202

John Massouh (Texas Bar # 24026866)
SPROUSE SHRADER SMITH PLLC
701 S. Taylor, Ste. 500 (79101)
Amarillo, TX 79105
john.massouh@sprouselaw.com
T: (806) 468-3300
F: (806) 373-3454